**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | :    Civil Action No. |
| | :    **3:08-CV-0499-N** |
| **W FINANCIAL GROUP, LLC,** | : |
| **ADLEY H. ABDULWAHAB a/k/a Adley Wahab**, | : |
| **MICHAEL K. WALLENS, SR.**, **and** | : |
| **MICHAEL K. WALLENS, JR.** | : |
| | : |
| Defendants, | : |
| | : |

**MEMORANDUM IN SUPPORT OF APPLICATION OF PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION FOR ORDER TO SHOW CAUSE WHY**
**DEFENDANT ADLEY H. ABDULWAHAB a/k/a ADLEY WAHAB SHOULD NOT BE**
**HELD IN CIVIL CONTEMPT FOR FAILURE TO COMPLY WITH THE COURT'S**
**ORDERS AND WHY RUSSELL MACKERT, SARAH WAHAB AND STEPHEN KOMIE**
**SHOULD NOT BE HELD IN CONTEMPT FOR AIDING AND ABETTING ADLEY**
**<u>WAHAB'S CONTEMPTUOUS CONDUCT</u>**

JEFFREY B. NORRIS
Attorney for Plaintiff
Securities and Exchange Commission
801 Cherry Street, 19th Floor
Fort Worth, Texas  76102
(817) 978-6452
(817) 978-4927 (fax)
NorrisJ@sec.gov

**TABLE OF CONTENTS**

Table of Contents.............................................................................................i-ii

Table of Authorities ..................................................................................... iii-vi

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     BACKGROUND.................................................................................. 4

        A.      The Commission's Complaint ...................................................... 4

        B.      Relief Requested and Granted in this Matter ................................. 6

                1.  Special Master Order ........................................................ 6

                2.  *Ex Parte* Freeze Order and Request for Appointment of Receiver ................. 7

                3.  Agreed Interlocutory Order and Judgment .................................. 9

                4.  Prior Contempt Motions, Hearing and Remedies ......................... 11

III.    A. WAHAB, MACKERT AND S. WAHAB HAVE ENGAGED IN A SCHEME TO HIDE
        ASSETS AND EXPENDITURES IN VIOLATION OF THE ASSET FREEZE ....................... 12

        A.      During the Asset Freeze, A. Wahab and S. Wahab Have Received Hundreds
                of Thousands of Dollars "Laundered" Through Mackert's Attorney Trust
                Account ................................................................................. 12

                1.  Introduction ........................................................... 12

                2.  Respondents Conceal Assets and Expenditures Through LKJ and Wert ......... 13

                3.  While Asserting the Fifth Amendment Privilege, S. Wahab Fails to Deny
                    Her Role in A. Wahab's Scheme to Hide Assets, Launder Funds Through
                    Mackert's Trust Account, and Spend Funds in Violation of the Court's Asset
                    Freeze ................................................................. 19

        B.      A. Wahab and S. Wahab, with Mackert's Assistance, Secretly Transferred $2
                Million to an Offshore Account and Have Spent the Funds During the Asset
                Freeze ................................................................. 22

IV.     THE CONSPIRACY TO VIOLATE THE ASSET FREEZE HAS BEEN FACILITATED BY A.
        WAHAB'S CONTINUED FLAUNTING OF HIS OBLIGATIONS UNDER THE REPORTING
        AND ACCOUNTING PROVISIONS OF THE INTERLOCUTORY ORDER .......................... 24

V.      THE COURT SHOULD ISSUE AN ORDER OF CONTEMPT AGAINST A. WAHAB,
        MACKERT, S. WAHAB AND KOMIE............................................................. 27

A.    Civil Contempt is Appropriate to Redress A. Wahab's Failure to Comply With This Court's Orders.........................................................................................27

B.    Mackert, S. Wahab and Komie Aided and Abetted A. Wahab's Violations...........29

VI.    THE COURT SHOULD ISSUE APPROPRIATE SANCTIONS AND REMEDIES AGAINST A. WAHAB, MACKERT, S. WAHAB AND KOMIE ...............................................................34

A.    Coercive Sanctions Should be Issued to Compel Compliance with the Court's Orders and to Rectify the Damage Caused by A. Wahab's Violations.................34

B.    A. Wahab and S. Wahab Should Be Subject to a Broad Asset Freeze And a Receiver Should be Appointed Over Their Assets..............................................37

C.    Asset Freeze on Mackert's Financial Accounts...................................................42

D.    Sworn Accountings by S. Wahab, Mackert and Komie .......................................43

E.    Additional Ancillary Relief ................................................................................44

VII.    CONCLUSION.........................................................................................................45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Alstom SA*,
   454 F. Supp. 2d 187 (S.D.N.Y. 2006) .................................................................32

*Am. Airlines, Inc. v. Allied Pilots Ass'n.*,
   228 F.3d 574 (5th Cir. 2000) ...........................................................................34

*Baxter v. Palmigiano*,
   425 U.S. 308 (1976) ..............................................................................22, 32

*CFTC v. Am. Metals Exch. Corp.*,
   991 F.2d 71 (3d Cir.1993) ...............................................................................37

*CFTC v. Int'l Fin.*,
   323 F. Supp. 2d 482 (S.D.N.Y. 2004) .................................................................32

*CFTC v. Wellington Precious Metals, Inc.*,
   950 F.2d 1525 (11th Cir. 1992)........................................................................28

*Castleglen, Inc. v. Commonwealth Sav. Ass'n*,
   689 F. Supp. 1069 (D.Utah 1988) ....................................................................37

*Chao v. Transocean Offshore, Inc.*,
   276 F.3d 725 (5th Cir. 2002) ...........................................................................29

*Craighead v. E.F. Hutton & Co.*,
   899 F.2d 485 (6th Cir.1990) ............................................................................37

*In re Dinnan*,
   625 F.2d 1146 (5th Cir. 1980) .........................................................................35

*In re Dinnan*,
   661 F.2d 426 (5th cir. 1981)............................................................................35

*Donovan v. Mazzola*,
   716 F.2d 1226 (9th Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984) .......................28

*FDIC v. Faulkner*,
   991 F.2d 262 (5th Cir. 1993) ...........................................................................39

*FDIC v. LeGrand*,
   43 F.3d 163 (5th Cir. 1995) .............................................................................35

*FTC v. Assail, Inc.*,
   410 F.3d 256 (5th Cir. 2005) ............................................................................33

*FTC v. Olmstead*,
   528 F.3d 1310 (11th Cir. 2008)........................................................................38

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007) .............................................................31

*FTC v. Arlington Press, Inc.*,
   1999 WL 33574020 (C.D. Cal.) .......................................................................43

*Hicks v. Feiock*,
   485 U.S. 624 (1988) ..................................................................................28, 34

*Gompers v. Bucks Stove & Range Co.*,
   221 U.S. 418 (1911) .........................................................................................34

*Hutto v. Finney*,
   437 U.S. 678 (1978) .........................................................................................35

*Int'l Controls Corp. v. Vesco*,
   490 F.2d 1334 (2d. Cir. 1974), *cert. denied*, 417 U.S. 932 (1974) .................37

*Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of Am.*,
   609 F.2d 165 (5th Cir. 1980) .....................................................................28, 29

*Levine v. Comcoa, Ltd.*,
   70 F.3d 1191 (11th Cir.1995) ....................................................................38, 42

*LiButti v. United States*,
   107 F.3d 110 (2d Cir.1997) .......................................................................22, 32

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) .........................................................................................28

*NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*,
   882 F.2d 949 (5th Cir. 1989) ...........................................................................29

*Penfield Co. of California v. SEC*,
   330 U.S. 585 (1947) .........................................................................................34

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
   673 F.2d 53 (2d Cir. 1982) ...............................................................................35

*Petroleos Mexicanos v. Crawford Enter., Inc.*,
   826 F.2d 392 (5th Cir. 1987) ...........................................................................28

*Powell v. Ward*,
   643 F.2d 924 (2d Cir. 1981), *cert. denied*, 454 U.S. 832 (1981) ....................... 27, 35

*Raffel v. US*,
   271 U.S. 494 (1926) ........................................................................................... 32

*Randall v. Loftsgaarden*,
   478 U.S. 647 (1986) ........................................................................................... 37

*SEC v. Autocorp Equities, Inc.*,
   292 F.Supp.2d 1310 (D.Utah 2003) .................................................................... 33

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998) ................................................................................ 38

*SEC v. Comcoa, Ltd.*,
   887 F. Supp. 1521 (S.D.Fla.1995) ................................................................ 38, 42

*SEC v. Credit Bancorp, Ltd.*,
   386 F.3d 438 (2d Cir. 2004) ................................................................................ 42

*SEC v. Current Fin, Serv., Inc.*,
   783 F. Supp. 1441 (D.D.C.1992) ........................................................................ 37

*SEC v. ETS Payphones, Inc.*,
   408 F.3d 727 (11th Cir. 2005) ............................................................................ 37

*SEC v. First Fin. Group of Texas*,
   645 F.2d 429 (5th Cir. 1981) .............................................................................. 38

*SEC v. First Fin. Group*,
   659 F.2d 660 (5th Cir. 1981) .............................................................................. 28

*SEC v. Manor Nursing Ctrs., Inc.*,
   458 F.2d 1082 (2d Cir.1972) ............................................................................... 37

*SEC v. Pension Fund of Am., L.C.*,
   2006 WL 1104768 (S.D. Fla.) ............................................................................. 39

*SEC v. Pinez*,
   989 F. Supp. 325 (D.Mass.1997) ........................................................................ 38

*SEC v. R.J. Allen & Assoc., Inc.*,
   386 F. Supp. 866 (S.D. Fla. 1974) ...................................................................... 44

*SEC v. Unifund SAL*,
   910 F.2d 1028 (2d Cir.1990) ......................................................................... 37, 38

*In re San Vicente Medical Partners, Ltd.,*
   962 F.2d 1402 (9th Cir. 1992) ............................................................38

*Shillitani v. United States,*
   384 U.S. 364 (1966) ................................................................27, 34

*Test Masters Educ. Serv., Inc. v. Singh,*
   428 F.3d 559 (5th Cir. 2005) ..............................................................34

*Thomas v. Capital Sec. Serv., Inc.,*
   836 F.2d 866 (5th Cir. 1988) ..............................................................34

*United States v. Barnette,*
   129 F.3d 1179 (11th Cir. 1997) ...........................................................39

*United States v. Londondio,*
   420 F.3d 777 (8th Cir. 2005) ..............................................................30

*United States v. Richards,*
   638 F.2d 765 (5th Cir. 1981) ..............................................................30

*United States v. Ross,*
   243 F. Supp. 496 (D.C.N.Y. 1965) ........................................................29

*United States v. United Mine Workers of Am.,*
   330 U.S. 258 (1947) ................................................................34, 35

*US v. One Parcel of Property,*
   897 F.2d 97 (2d. Cir. 1990) ..............................................................32

*Vuitton et Fils S.A. v. Carousel Handbags,*
   592 F.2d 126 (2d Cir. 1979) ..............................................................35

*Waffenschmidt v. Mackay,*
   763 F.2d 711 (5th Cir. 1985) ..........................................................29, 30

*Wallis v. Baldwin,*
   70 F.3d 1074 (9th Cir. 1995) ..............................................................30

*Whitfield v. Pennington,*
   832 F.2d 909 (5th Cir. 1987), *cert. denied*, 487 U.S. 1205 (1988) .........................28

*In re Williams,*
   306 F. Supp. 617 (D.D.C. 1969) ..........................................................27

I.   **PRELIMINARY STATEMENT**

Plaintiff Securities and Exchange Commission ("Commission") submits this Memorandum in support of its application for an order to show cause why Defendant Adley H. Abdulwahab a/k/a Adley Wahab ("A. Wahab") should not be held in civil contempt for multiple violations of the Court's *Ex Parte* Order Freezing Assets and Granting Other Emergency Relief ("June 5 Order") and Agreed Interlocutory Order ("Interlocutory Order").   The Commission also requests that three non-parties, Russell Mackert ("Mackert"), Sarah Wahab ("S. Wahab"), Adley Wahab's wife, and Stephen M. Komie ("Komie"), A. Wahab's attorney of record in this case, be ordered to show cause why they should not be held in contempt for aiding and abetting A. Wahab's repeated violations of the Court-imposed asset freeze.   In connection with these contempt proceedings, the Commission seeks compensation from the respondents for funds alienated in violation of the Court's orders.   The Commission also requests that the Court impose equitable relief that is both concomitant with the greed and lawlessness of participants in the scheme described here and adequate to protect the interests of Defendants' victims going forward.

The Commission has recently uncovered evidence of an elaborate scheme by A. Wahab to hide funds and assets from law enforcement authorities and conceal his expenditure of millions of dollars, both before and after the Court-imposed asset freeze.[1]   In the summer of 2007, A. Wahab became aware that the Commission was investigating the fraud perpetrated by W Financial Group, LLC ("WFG") and its principals, A. Wahab, Michael K. Wallens, Sr. ("Wallens Sr.") and Michael K. Wallens, Jr ("Wallens Jr.").   Beginning in late summer 2007, A. Wahab transferred more than $12 million from an account he controlled at Wells Fargo Bank to the

---

[1]      Although the events relevant to the violations span from at least September 2007 to the present, the Commission started to uncover evidence of the conspiracy in November 2008, when it took the deposition of Russell Mackert.  Thereafter, the Commission took the deposition of S. Wahab, obtained relevant bank records from domestic as well as offshore banks, subpoenaed other documents, and interviewed numerous witnesses whose declarations are contained in the Appendix.

IOLTA trust account of Mackert, A. Wahab's personal attorney.   In January 2008, Mackert created two corporations, LKJ Vehicles Holdings, Inc. ("LKJ") and Wert Realty Holdings, Inc. ("Wert") and placed them under the nominal control of S. Wahab.

From no later than January 2008 until at least November 2008, Mackert has disbursed vast sums of money to LKJ and Wert, through S. Wahab, for A. Wahab's benefit.  Assets transferred to the corporations have included a house in Spring, Texas and a Ferrari automobile, which A. Wahab subsequently sold for $235,000 in August 2008, in violation of the Court's asset freeze.

In addition to this domestic misconduct, Mackert and S. Wahab have assisted A. Wahab to violate the Court's freeze orders repeatedly by covertly spending more than $1 million from offshore accounts in Jersey in the British Channel Islands.  Mackert helped A. Wahab and his wife set up the accounts and funded them with $2 million from Mackert's trust account.  From the date of the *ex parte* freeze on June 5, 2008 until at least mid-February 2009, the Wahabs have spent these funds in violation of the asset freeze.

A. Wahab has concealed these activities through his continued violations of the reporting and accounting requirements contained in the Court's Interlocutory Order.  A. Wahab has never adequately complied with the reporting provisions that were the subject of the Commission's previous application for contempt, filed in September 2008.  He has ignored the reporting requirements or provided tardy, false or incomplete information.  Similarly, A. Wahab has provided false and incomplete information to Max Wayman & Associates ("MMWA") to avoid disclosing his assets and sources of expenditures.

The Commission has also learned that A. Wahab wired Defendants' counsel, Stephen Komie, $75,000 from the offshore account in Jersey while subject to the June 5 Order.  As Komie was retained to help Defendants ameliorate the hardship purportedly caused by the *ex*

*parte* freeze, he can hardly claim that he accepted these funds with clean hands.  In spite of requests by the Commission, Mr. Komie has refused to pay these funds into the registry of the Court.

Additionally, the Commission has recently obtained documents in which A. Wahab and his wife express an intention to relocate from the United States to a foreign jurisdiction.  A. Wahab's extensive family ties and business interests in the Middle East would facilitate their flight.  The Commission submits that the Court should grant relief to prevent A. Wahab from fleeing before he has satisfied his obligations to the victims of the WFG fraud.

There is a high probability that these, or similar, violations are continuing as the Court considers this motion.  Mackert has refused to provide assurances that he will cease disbursing funds on behalf of the Wahabs.  Moreover, the evidence demonstrates that the Wahabs continued to use and distribute funds from their offshore accounts well into February 2009.  In fact, after the Commission disclosed its knowledge of the Jersey bank accounts, S. Wahab attempted in February 2009 to withdraw the remaining funds from the account.  Only the intervention of the Jersey Financial Services Commission ("JFSC") prevented her from inflicting substantial additional harm on WFG victims.

The Commission requests that the Court hold A. Wahab in contempt for his numerous violations of this Court's orders and hold S. Wahab, Mackert and Komie in contempt for aiding and abetting A. Wahab's violations.  The Commission also requests that the Court use its legal and equitable powers to address the rampant abuse of its mandates.

A. Wahab should be required to account for every expenditure he has made, or has been made on his behalf, from June 5, 2008 to the present.  Mackert, S. Wahab and Komie should be required to account for all funds and assets that they have received from A. Wahab, or spent on his behalf, directly or indirectly, during the period from June 1, 2007 to the present.

The respondents should then be ordered to return any funds attributable to A. Wahab that they currently hold, or received, or spent in violation of the asset freeze.  If any of the respondents refuses to provide a sworn accounting or fails to repay these funds to the Receiver or into the registry of the Court, the Court, absent proof of impossibility, should incarcerate the respondent until he or she complies.

Of even greater importance, the Commission requests that the Court alter and supplement the equitable relief it granted previously in order to more adequately protect investors from the further dissipation of assets that should be preserved for payment of disgorgement and civil penalties and, ultimately, to compensate elderly victims.  In light of the egregious violations established here, investors will be adequately protected only if, at minimum, the Court orders the following remedies:  (1)  reimpose on A. Wahab a blanket asset freeze similar to the freeze contained in the June 5 Order, add S. Wahab to this freeze order, and place on the Wahabs the burden of establishing their entitlement to an allowance of any kind; (2) place the assets of A. Wahab and S. Wahab under the existing Receivership to marshal and conserve them for the benefit of investors; (3) issue an order requiring A. Wahab and S. Wahab to repatriate all funds and assets they have in foreign jurisdictions; (4) to prevent A. Wahab and S. Wahab from implementing their stated intent to establish residence abroad, issue an order requiring that A. Wahab and S. Wahab surrender their passports to the Court; and (5) pending his accounting and return of funds he helped dissipate, freeze all of Mackert's financial accounts.

## II.   BACKGROUND

### A.   The Commission's Complaint

The Commission filed its Complaint in this matter on March 3, 2008.  According to the Complaint, from at least September 2006 through February 2007, Defendants perpetrated what

can only be described as an egregious and pervasively fraudulent offer and sale of securities denominated Secured Debt Obligations ("SDO").

Defendants asserted that the SDOs were protected from loss by multiple layers of insurance and the risk of loss was minimized by use of the funds only to purchase a specified list of safe investments. Defendants further represented that each investor's funds would be protected by collateral. Finally, the Defendants impressed investors by touting the long history of financial responsibility of WFG and its principals.

In reality, customers' investments were not protected by many layers of insurance, as Defendants claimed; in fact, they were not insured at all. Moreover, no collateral was ever assigned to protect investors against loss.

In addition, only a tiny fraction of funds collected from investors was used for the purposes represented by Defendants. Instead, WFG investor funds were pervasively misused for unauthorized and undisclosed purposes. Millions of investor dollars were diverted into risky ventures such as National Power Company and W Custom Homes. This undisclosed diversion of funds subjected investors' dollars to severe market risks without the safety of the guarantees or insurance prominently touted by Defendants. Additionally, funds were diverted for the personal benefit of Defendants.

Finally, WFG and its principals, contrary to the description provided by Defendants, did not have a "17 year history" of unblemished commercial accomplishment. In truth, WFG had no history, as it was created in 2006 for the purpose of conducting the fraudulent scheme. Moreover, during the WFG offering, A. Wahab was on probation for felony forgery, a fact not disclosed to WFG investors.

As a consequence of Defendants' misrepresentations and omissions, more than 180 investors, primarily elderly and retired, placed their savings in WFG securities. The

overwhelming majority of these investors were seeking the safety and security of an FDIC-insured Certificate of Deposit.  Relying on Defendants' misrepresentations and omissions, they believed that WFG SDOs, with their purported multiple layers of insurance, provided the safety and security they desired.  As a result of Defendants' scheme, many of these senior citizens face the prospect of losing substantial portions of the savings they accumulated during their working years.

        B.      **Relief Requested and Granted in this Matter**

           1.      **Special Master Order**

As this Court is aware, the Commission and Defendants, through their counsel David Fielder, entered into an agreement to permit the Defendants to liquidate assets that they had purchased with investor funds.  Pursuant to this agreement, the Court, on March 28, 2008, entered an Agreed Order Appointing Special Master to Monitor the Sale of Assets Held by Defendants ("Special Master Order") and appointed Vernon T. Jones, Jr. as Special Master.  The Commission acquiesced in this course of action based on its belief that the Defendants were acting in good faith and were following the guidance of counsel.  Accordingly, the Commission concluded in March 2008 that investors would be adequately protected by a Special Master who would oversee the liquidation process and take custody of the proceeds of these transactions.

In the Special Master Order, the Court required the Defendants to cooperate with Mr. Jones in the liquidation of defined assets, provide the Special Master with timely information about transactions, account to Mr. Jones for the proceeds of transactions and turn all proceeds over to the Special Master, for the benefit of defrauded investors.  Unfortunately, from the moment of Mr. Jones' appointment, Defendants failed and refused to cooperate with the Special Master, as envisioned in the Court's Order.  Defendants' defiant and deceitful misconduct through June 5, 2008 is set forth at length in the Commission's Memorandum in Support of

Motions For Appointment of a Receiver, Order Freezing Assets, Repatriation Order, Order Requiring Accountings and Other Equitable Relief ("June 5 Memo") and the accompanying Appendix.  Defendants' recalcitrance was further delineated in the Memorandum in Support of Special Master and Securities and Exchange Commission's Emergency Motion to Show Cause and accompanying Appendix. [Docket ## 78 and 82].

### 2.    *Ex Parte* Freeze Order and Request for Appointment of Receiver

Subsequent to the entry of the Special Master Order, the Commission maintained regular communications with Vernon Jones to determine whether the Defendants were complying with the Court's mandates.  As the Special Master encountered one obstacle and deception after another, the Commission concluded that WFG investors required greater protection from further loss at the hands of the Defendants.

In addition to Defendants' frequent violations of the Special Master Order, the Commission became increasingly concerned that the Special Master Order covered only a subset of assets potentially available to reimburse investors and did not, for example, preserve the Defendants' personal assets.  This concern became particularly acute after two specific events.  First, the Special Master conducted an analysis of the liquidation value of the assets Defendants had agreed to liquidate; the analysis concluded that the liquidation would likely garner funds sufficient to restore 40 percent of investor losses.  Second, the National Power Company, represented by Defendants as an asset worth several millions of dollars, proved to be insolvent and was forced to close due to its inability to meet state regulatory requirements. Following these events, it was clear that the Defendants' personal assets needed to be accounted for and conserved to maximize the potential recovery for victims of the WFG fraud.

On June 5, 2008, therefore, the Commission filed, on an *ex parte* basis, a Motion for Order Freezing Assets and Other Emergency Relief and a Motion for Appointment of a Receiver.

[Not Docketed].  These Motions were supported by the June 5 Memo and Appendix.  In these documents, the Commission provided detailed evidence of Defendants' egregious violations of the federal securities laws.  Additionally, the Commission provided copious proof that WFG's assets as well as the personal assets of the individual Defendants should be protected, marshaled and conserved by an asset freeze and the appointment of a Receiver.

On the date of the filing, the Court granted the Commission's request and issued the *Ex Parte* Order Imposing Asset Freeze and Granting Other Emergency Relief. [Not docketed].  Accepting the need for relief with a broader scope than the Special Master Order, the Court's asset freeze covered not only the assets of WFG, but also the personal assets of the individual Defendants.  Among the other emergency relief mandated by the June 5 Order, each of the Defendants was required to provide a detailed accounting.  The accounting required WFG, as well as the individual Defendants, to provide, within one day of the hearing scheduled by the Court, comprehensive information concerning their present assets, the use of funds collected from investors, and to details of all financial accounts they had controlled since January 1, 2006.  In spite of the Court's clear mandate, the Defendants failed to provide the required accounting.

While the Court granted the Commission's request for the June 5 Order, it postponed action on the Commission's request to appoint a Receiver until an adversary hearing.  Initially, the hearing was scheduled to take place on June 13, 2008, then rescheduled to take place on June 25, 2008.  Shortly before the June 25 hearing date, Stephen J. Komie and John Teakell substituted in as counsel for Defendants, in place of David Fielder, who resigned because Defendants had repeatedly deceived him and withheld vital information.

On June 25, the Commission appeared in Court with eight witnesses, prepared to augment the evidence already provided to the Court.  Unfortunately, Magistrate Judge Jeff

Kaplan was unexpectedly unavailable to hold a full hearing.  Rather, he told the Commission and Defendants' new counsel to attempt to negotiate mutually agreeable orders.

### 3.    Agreed Interlocutory Order and Judgment

Beginning on June 25, 2008, the Commission attempted to negotiate orders providing relief that would safeguard assets of WFG and the individual Defendants and otherwise speed maximum relief to Defendants' victims.  Defendants' counsel agreed to cooperate in drafting an agreed freeze order and an interlocutory judgment providing for permanent injunctive relief.

During discussions, Defendants' counsel stressed Defendants' desire for various exceptions to the freeze order.  Commission trial counsel stressed that an agreed order would need to provide remedies sufficiently broad and immediate to quickly secure and preserve all assets that would be available to provide defrauded investors with monetary relief.  To these ends, the Commission insisted that the modified freeze order must cover Defendants' personal assets, as well as the assets of WFG.  The Commission further insisted that exceptions to the freeze be subject to reporting requirements to prevent abuse.  Additionally, the Commission emphasized the need for an accounting, conducted with all deliberate speed, that would mirror the terms of the accounting described in the June 5 Order.  Only such a broad accounting, performed with immediacy, would result in timely identification of all of the assets that required protection from waste and dissipation.  Defendants' counsel understood that only with these protections would the Commission forego its request for a Receiver and leave assets in the hands of the Defendants.

In spite of counsels' promise to cooperate in drafting appropriate orders, Defendants' input was so tardy that the Commission was compelled to ask the Court to schedule another evidentiary hearing on its request for emergency relief.  On July 25, the Commission again arrived at Court with numerous witnesses, once more prepared to augment its already

compelling evidence of Defendants' fraudulent conduct and the need for a full array of stringent remedies.  In a sidebar, however, the Defendants' counsel, Stephen Komie and John Teakell, finally expressed their willingness to accept the terms laid down by the Commission.  As a result, the Commission and Defendants counsel drafted and presented to the Court before the end of that day, a Stipulation and Consent [Docket # 74], Interlocutory Judgment by Consent Granting Interlocutory Injunction and Other Equitable Relief ("Injunctive Order") [Docket # 73] as well as the Interlocutory Order.

The Interlocutory Order includes a broad and inclusive freeze of the assets of each Defendant, coupled with certain specific exceptions.  To prevent abuse of the exceptions, the Interlocutory Order requires that the Defendants provide an array of information to facilitate monitoring Defendants' financial activities.  Paragraph 7 of the Interlocutory Order permits each of the individual Defendants to pay "reasonable and ordinary living expenses."  This provision, however, contains requirements that facilitate the ability of the Commission to monitor these expenditures to assure that the Defendants do not abuse this privilege.  The Defendants are required to open new bank accounts for the purpose of depositing and withdrawing funds to pay living expenses.  Further, Paragraph 7 states that only funds earned after the entry of the Interlocutory Order may be deposited into the "living expenses" account and spent on living expenses.  To facilitate monitoring, the Defendants are required to provide the Commission with identifying information about each of their accounts within three (3) days from the date the account is opened.  Finally, the Defendants are required to provide the account statements for these accounts at the end of August 2008 and, thereafter, required to provide itemized quarterly reports of their expenses.

Defendants, including A. Wahab, were fully aware of the restrictions and requirements imposed by the Interlocutory Order.  Each of them signed the Interlocutory Order

in the Courtroom on July 25, 2008.  The Court entered the Interlocutory Order on July 30, 2008.

### 4.    Prior Contempt Motions, Hearing and Remedies

On September 16, 2008, Vernon Jones, then Special Master, and the Commission filed the Special Master and Securities and Exchange Commission's Emergency Motion to Show Cause and for Equitable Relief, together with a supporting Memorandum and Appendix ("Joint Contempt Motion").  [Docket ## 77-79].  In the Joint Contempt Motion, the Special Master and Commission set forth in exhaustive detail the Defendants' repeated and serious deviations from the mandates of the Court's Special Master Order.  To remedy Defendants' continuing acts of deceit and defiance, the Joint Contempt Motion requested that the Court issue coercive sanctions and appoint a Receiver over the assets of all Defendants.

On September 26, 2008, the Commission filed a separate Application of Plaintiff Securities and Exchange Commission for Order to Show Cause Why Defendants Should Not be Held in Contempt for Failure to Comply with the Court's Order, and accompanying Memorandum and Appendix ("First Contempt Motion").[2]   [Docket ## 83-85].  In the First Contempt Motion, the Commission delineated Defendants' numerous and ongoing violations of the Interlocutory Order, including their failure to provide a sworn accounting and their pervasive evasion of reporting requirements crucial to monitoring their compliance with the order's restrictions on their expenditures.  In light of these egregious and prolonged violations, the Commission requested that the Court issue coercive sanctions and appoint a Receiver over the assets of all Defendants.

On October 17 and 24, 2008, the Court held an evidentiary hearing on the September Contempt Motions.  This hearing provided further corroboration that the Defendants were

---

[2]      The Joint Contempt Motion and First Contempt Motion will be referred to jointly as the "September Contempt Motions."

ignoring their obligations under the Special Master Order and Interlocutory Order.  After a two-day evidentiary hearing, the Court granted both contempt motions.  The sole remedy imposed by the Court, however, was placing the corporate assets formerly subject to the Special Master Order in receivership.[3]

### III.    A. WAHAB, MACKERT AND S. WAHAB HAVE ENGAGED IN A SCHEME TO HIDE ASSETS AND EXPENDITURES IN VIOLATION OF THE ASSET FREEZE

#### A.    During the Asset Freeze, A. Wahab and S. Wahab Have Received Hundreds of Thousands of Dollars "Laundered" Through Mackert's Attorney Trust Account

#### 1.    Introduction

Evidence gathered by the Commission demonstrates that A. Wahab, with the assistance of Mackert and S. Wahab, has sought to hide assets from authorities and has unlawfully evaded the limitations and restrictions imposed by the Court's asset freeze.  A. Wahab's efforts to conceal his assets and expenditures began prior to the Court's entry of the June 5 Order and have continued through the present.

In September 2007, after the Defendants became aware of the Commission's investigation of the fraudulent WFG investment program, A. Wahab began transferring large sums of money to the trust account of Mackert, a Houston attorney. [App. 264-282, 287-322][Sparks Dec. at ¶¶ 4-7, Exhs. 1, 2a, 2b and 2c; White Dec. and Exhs. 1 and 2; Allmendinger Dec. and Exhs. 1 and 2; Oncale Dec. and Exhs. 1 and 2].  By November 2007, A. Wahab had transferred $12.6 million to Mackert's account.[4] [id.].

---

[3]    Obviously, at the time of the contempt hearing, neither the Commission nor the Court was aware of A. Wahab's elaborate conspiracy to hide assets and expenditures.  Nor could the Court foresee that A. Wahab's defiance of the reporting and accounting provisions of the Interlocutory Order would continue unabated for months after the hearing.

[4]    During this period, the following three wire transfers were made to Chase Bank for the benefit of "Russell Mackert Attorney at Law IOLTA Account": (1) a September 14, 2007 wire transfer in the amount of $2 million; (2) a November 1, 2007 wire transfer in the amount of $8 million; and (3) a November 21, 2007 wire transfer in the amount of $2,508,555.58.  The funds were transferred from A&O Life Funds, LP

In January 2008, Mackert created LKJ and Wert, corporations organized under the laws of the state of Texas. [App. 003-007, 072-100][Mackert LKJ Depo at 9-28, Exhs. 11 and 12]. Although Mackert refused to reveal who requested that he organize these corporations, the Commission submits that the evidence, taken as a whole, demonstrates that LKJ and Wert were created at the request of A. Wahab. [App. at 013-014][Mackert LKJ Depo at 52-53]. According to corporate records, Mackert was the initial director of these corporations and serves as their registered agent for service of process. [App. 003-007, 072-100][Mackert LKJ Depo at 9-28, Exhs. 11 and 12].

In November 2008, the Commission served subpoenas and notices under Federal Rule of Civil Procedure 30(b)(6), seeking testimony from corporate representatives of LKJ and Wert concerning, among other things, their acquisition, sale or transfer of assets. On November 21, 2008, Mackert gave testimony pursuant to these subpoenas.[5] [App. 001-049][Mackert LKJ Depo; Mackert Wert Depo].

## 2.    Respondents Conceal Assets and Expenditures Through LKJ and Wert

Pursuant to the LKJ subpoena, Mackert produced corporate documents, including LKJ's Certificate of Formation, Bylaws and Minutes of Organizational Meeting of the Board of Directors of LKJ. [App. 003, 072-098][Mackert LKJ Depo at 9-11, Exh. 11]. Mackert, who admitted creating these documents, confirmed that he submitted the Certificate of Formation on or about January 11, 2008 and drafted the corporate minutes on or about January 18, 2008. [App. 003-

---

Account No. 3192102369 at Wells Fargo Bank ("A&O Account."). [*id.*] During this entire period, A. Wahab was a signatory on the A&O Account. [App. at 265-266, 287-322][Sparks Dec. at ¶ 5; White Dec. and Exhs. 1 and 2; Allmendinger Dec. and Exhs. 1 and 2; Oncale Dec. and Exhs. 1 and 2]. Each of the other individuals who were signatories on the account during the relevant period has provided the Commission with declarations stating that they did not initiate any of these wire transfers. [*id.*].

[5]    Although Mackert appeared at the scheduled depositions, he denied that he was the person designated by the corporations to give deposition testimony on the topics designated under Rule 30(b)(6). Mackert asserted that he was testifying as the corporations' registered agent and attorney. [App. 002, 034-035][Mackert LKJ Dec. at 5; Mackert Wert Dec. at 4-5].

007, 013, 072-098][Mackert LKJ Depo at 9-28, 51-52, Exhs. 11].   The Minutes show that at the organizational meeting, the 1,000 shares of LKJ stock were assigned to S. Wahab. [App.  005-006, 095-098][Mackert Depo at 20-21, Exh. 11].  Further, A. Wahab was named President of LKJ, while S. Wahab was selected to be Secretary and Treasurer. [*id.*].

The evidence strongly suggests that Mackert created LKJ for the express purpose of concealing A. Wahab's purchase and ownership of a Ferrari.[6] [App. 0013-021, 140-150, 323-338][Mackert LKJ Depo at 52-81, Exhs.18 and 19; Maniaci Dec. and Exhs. 1 and 2].  On January 11, 2008, A. Wahab purchased a model F430FSP from Ferrari of Houston for $315,000 cash. [*id.*]  The sales person at Ferrari of Houston, where the Ferrari was purchased, states that A. Wahab alone arranged the purchase. [App. 323-338][Maniaci Dec. at ¶ 3-10, Exhs. 1 and 2]. Nonetheless, A. Wahab had the Ferrari registered in the name of LKJ.  Mackert admits that he used funds from his trust account to pay for the Ferrari. [App. 015-021, 150][Mackert LKJ Depo at 59-81, Exh. 19].

The Commission served Mackert with a copy of the June 5 Freeze Order within days of its entry. [App. 262-263][Stewart Dec.][Docket # 44].  Mackert indicated that he read the order he received from the Commission at or near the time he received it. [App. 012][Mackert LKJ Depo at 47].  Mackert also admits learning of the Interlocutory Order, although he claims to be uncertain when he obtained this knowledge. [App. 011, 108-137][Mackert LKJ Depo at 43-49, Exhs. 14-16].  In spite of his knowledge of the asset freeze, Mackert, in August 2008, assisted A. Wahab in selling the Ferrari and using the proceeds for A. Wahab's own benefit, in violation of the Interlocutory Order. [App. 021-022, 151-160, 340-341][Mackert LKJ Depo at 84-88 and Exh. 20; Kimmel Dec. at ¶¶ 8-11].

---

[6]      A. Wahab later sold the Ferrari in violation of the asset freeze.  Photographs of the Ferrari were posted on the website of the dealership that purchased the Ferrari in August 2008.  [App. 350, 357-367][Powers Dec. at ¶ 14, Exh. 2].

Lamborghini Houston ("LH"), which purchased the Ferrari from A. Wahab, produced documents to the Commission and provided sworn statements from its owner and two other employees.  [App. 339-370][Kimmel Dec. and Exh. A; Powers Dec. and Exhs. 1 and 2; Seales Dec.].  These demonstrate that A. Wahab sold the Ferrari to LH on August 14, 2008, for $235,000. [*id*.].  The documents identify "LKJ Vehicle Holdings" as the seller. [App. 349-356][Powers Dec. and Exh. 1].  After A. Wahab negotiated the sale, S. Wahab facilitated the transaction by accompanying him to the dealership to sign paperwork on behalf of LKJ. [App. 044-045, 151, 152, 340-341, 349-350, 352-356][S. Wahab LKJ Depo at 44-48, Exh. 20; Kimmel Dec. at ¶¶ 8-13; Powers Dec. at ¶¶ 8-12, Exh. 1].  LH employees who participated in the transaction confirm that the sale was arranged entirely by Mr. Wahab. [App. 339-340, 348-349, 368-369][Kimmel Dec. at 3-9; Powers Dec. at 3-10; Seale Dec. at 3-0].  The Wahabs instructed LH to pay the proceeds of the sale to Mackert. [App. 350, 354][Powers Dec. at 10-12, Exh. 1].

In his deposition testimony, Mackert confirmed that the Ferrari sold to LH in August 2008 was the same automobile purchased by A. Wahab in January 2008. [App. 021-022][Mackert LKJ Depo at 84-87].  Mackert admits receiving from LH a company check for $235,000 made out to "Russell Mackert FBO LKJ Vehicle Holdings Inc.," representing the proceeds of the sale, and he further admits that he deposited the funds into his trust account. [*id*.].

Mackert testified that, in spite of his knowledge of the asset freeze, he distributed the $235,000 according to instructions given by S. Wahab, as the principal of LKJ. [App. 022-024, 031-032][Mackert LKJ Depo at 87-95, 123-125].  According to Mackert, S. Wahab told Mackert to distribute the funds to various contractors working on the construction of the Wahabs' newly-built luxury residence in Spring, Texas. [*id*.]

Remarkably, the evidence obtained by the Commission establishes that even as he was violating the asset freeze by selling the Ferrari, A. Wahab was planning to purchase one or more additional Ferraris in contravention of the Court's orders. According to several witnesses, A. Wahab had placed an order, formally or informally, for one or more Ferrari Californias, a new model that Ferrari planned to introduce in early 2009. [App. 325, 340, 369-370, 372][Maniaci Dec. at ¶ 11; Kimmel Dec. at ¶ 7; Seale Dec. at ¶¶ 8 and 9; Yowell Dec. at ¶¶ 7-9]. Joseph Maniaci, the Sales Manager of Ferrari of Houston, recounts that A. Wahab was adamant about purchasing a California Spider as soon as the automobile became available. [App. 325][Maniaci Dec. at ¶ 11]. At A. Wahab's request, Maniaci placed him on a waiting list. [*id.*]. According to Maniaci, for months after the asset freeze, A. Wahab telephoned him repeatedly for updates about the expected release date of the California. [*id.*]. In October 2008, A. Wahab even came to the dealership unannounced to find out when he could formally order the California. [*id.*]. A. Wahab's frequent inquiries to LH stopped only after the Commission began its investigation of his January 2008 purchase of the Ferrari 430 Spider. [*id.*].

Also on November 21, 2008, Mackert made an appearance to give deposition testimony in response to a Rule 30(b)(6) subpoena and notice served on Wert, another corporate entity he organized. [App. 034-048][Mackert Wert Depo]. The evidence reflects that Wert, like LKJ, was created by Mackert to conceal A. Wahab's ownership of a specific asset. In the case of Wert, the asset was a house under construction at 5606 White Birch Run in Spring, Texas ("White Birch House").[7] [App. 051-055, 058-059, 164-200, 257-261][Mackert Wert Depo at 9-23, 41-45, Exh. 26, 27, 28 and R. Exh. 1]. Moreover, Mackert admits making disbursements of

---

[7]     In their depositions, both Mackert and S. Wahab identified a photograph of the White Birch House. [App. 041, 068, 199-200][Mackert Wert Depo at 31, Exh. 30; S. Wahab Wert Depo at 18, Exh. 30]. The photograph is included in the accompanying Appendix as Deposition Exhibit 30. [App. 199-200].

cash to S. Wahab in the name of Wert up to the time of his deposition. [App. 039-040][Mackert Wert Depo at 23-25].

Mackert's deposition testimony, as well as documents he produced, establishes that Wert was formed on the same day as LKJ, January 18, 2008. [App. 036-038, 164-192][Mackert Wert Depo at 9-17, Exh. 26, 27]. Again, Mackert admitted that he was the author of all of the Wert corporate documents. [*id.*]. Minutes of Board of Directors and shareholder meetings establish that all the shares of Wert were again distributed to S. Wahab. [*id.*]. In January 2008, Inayah Smith ("Smith"), A. Wahab's sister, was elected Director of Wert and selected as its President, Secretary and Treasurer. In April 2008, S. Wahab replaced Smith as Wert's Director and President. [*id.*].

According to public records, A. Wahab and S. Wahab purchased the White Birch property as a vacant lot on November 11, 2006. [App. 040, 195-196][Mackert Wert Depo at 26-28, Exh. 28]. Shortly after Wert was formed, A. Wahab and S. Wahab transferred title to the lot into the name of Wert. [App. 040-041, 197-198][Mackert Wert Depo at 27-32, Exh. 29]. Although he claimed to have a lapse of memory, Mackert admitted that he may have recorded the deed transferring the property to Wert. [App. 056][Mackert Wert Depo at 29-30]. Public records obtained from Montgomery County confirm that Mackert did, in fact, file the deed transferring the White Birch property to Wert.[8] [App. 376-387].

Mackert admits that from at least July through mid-November, he regularly disbursed funds to Wert, through Sarah Wahab, to pay for, among other expenses, the construction of A. Wahab's house. [App. 039-040][Mackert Wert Depo at 24-25]. This period precisely coincides with the period during which A. Wahab has been subject to the Court's current freeze order.

---

[8]    The deed contains a handwritten instruction to "return" the document [presumably a conformed copy] to "Russell E. Mackert" at Mackert's office address. [App. 381].

Although Mackert refused to estimate the total funds transferred out of his trust account for the benefit of A. Wahab, the disbursements must be substantial, as Mackert testified that in early summer of 2008, he personally observed that only the concrete slab for the White Birch House was completed.[9] [App. 039-040, 045-047][Mackert Wert Depo at 23-24, 48-49, 52-53]. Based on Mackert's observations, the house was completely built and furnished during the period of Mackert's clandestine disbursements to Wert. [App. 041][Mackert Wert Depo at 31-32]. In other words, most of the construction and furnishing of the White Birch House occurred after A. Wahab was subject to a Court-imposed freeze.[10]

Mackert admitted that the payments to the Wahabs were continuing through mid-November, shortly before Mackert's deposition. [App. 024, 039-040][Mackert LKJ Depo at 93-95; Mackert Wert Depo at 24-25]. Furthermore, Mackert refused to give any assurance that he will not continue to disburse funds for A. Wahab's benefit. [App. 024][Mackert Wert Depo at 24-25].

The Commission submits that only one reasonable inference can be drawn from the evidence collected by the Commission. In anticipation of adverse actions by law enforcement agencies, including the Commission, for his role in the WFG fraud, A. Wahab transferred funds to Mackert to conceal and protect in his trust account. Subsequently, A. Wahab, aided and abetted by Mackert and S. Wahab, set up LKJ and Wert to conceal A. Wahab's ownership of

---

[9]      Through Interrogatories directed to A. Wahab, the Commission attempted to quantify the amounts spent on constructing and furnishing the White Birch House during 2008. In September 2008, Defendants' counsel objected to these Interrogatories on the grounds that there had been no conference pursuant to Fed.R.Civ.P. 26. In response to this objection, the Commission, in spite of considerable foot-dragging by Defendants' counsel, managed to hold the required conference. Defendants' counsel, however, continued their refusal to respond to the Interrogatories, this time complaining that the same interrogatories were previously served. The illogical and disingenuous nature of this sequence of objections is apparently lost on the minds of Mr. Komie and Mr. Teakell.

[10]      The Commission has not yet obtained a formal appraisal of the value of the White Birch House, but is informed and believes that the value of the residence is in excess of one million dollars. Accordingly, it is very likely that the construction costs were in excess of $500,000. If Mackert's testimony is accepted, most of this expenditure occurred while A. Wahab's assets were frozen.

valuable assets, including the Ferrari and the White Birch House.  Thereafter, Mackert aided and abetted A. Wahab's violations of the Court's freeze orders by making periodic disbursements of funds to the corporations he created.  S. Wahab aided and abetted A. Wahab's violations by receiving the funds and using them for the benefit of her husband.  A. Wahab, again aided and abetted by Mackert and S. Wahab, violated the freeze order by selling his Ferrari to Lamborghini Houston in August 2008 and spending the proceeds.

> **3.    While Asserting the Fifth Amendment Privilege, S. Wahab Fails to Deny Her Role in A. Wahab's Scheme to Hide Assets, Launder Funds Through Mackert's Trust Account, and Spend Funds in Violation of the Court's Asset Freeze**

Based on Mackert's deposition testimony, the Commission served S. Wahab with Rule 30(b)(6) subpoenas and notices, again seeking corporate representatives to testify on behalf of LKJ and Wert.  Pursuant to these subpoenas, S. Wahab appeared and testified on December 19, 2008.[11] [App. 050-071][S. Wahab LKJ Depo; S. Wahab Wert Depo].  Throughout these depositions, S. Wahab responded to the vast majority of questions by asserting her Fifth Amendment privilege against self-incrimination. [*id.*].

Mrs. Wahab's occasional substantive responses corroborate Mackert's testimony.  S. Wahab confirmed that she is married to A. Wahab and admitted that they reside together at the White Birch House. [App. 051-052][S. Wahab LKJ Depo at 7-15].  She also confirmed that the White Birch House is a newly constructed residence and identified a photograph of the house. [App. 052, 068, 199-200][S. Wahab LKJ Depo at 11; S. Wahab Wert Depo at 18, Exh. 30].

S. Wahab also provided sufficient testimony about her education and employment history to eliminate her as the likely source of the funds A. Wahab and S. Wahab have spent in

---

[11]    While appearing in response to the Rule 30(b)(6) subpoenas and notices, S. Wahab, like Mackert, claimed that she was testifying as an individual, but denied being the appropriate person to testify for the corporation as to the matters set forth in the Commission's notice. [App. 051, 064-065][S. Wahab LKJ Depo at 8-9; S. Wahab Wert Depo at 5-6].  She also asserted that she did not know who the appropriate designee would be. [*id.*].

violation of the freeze, including the money disbursed to her by Mackert during 2008.  S. Wahab is a 25-year-old woman with less than one year of community college. [App. 052-053, 055-056][S. Wahab LKJ Depo at 14-15, 26-29].  Prior to her marriage, she worked as a waitress and in a series of clerical jobs, with modest remuneration. [App. 056-057][S. Wahab LKJ Depo at 29-32].  She indicated that she has not been employed since she married A. Wahab on July 25, 2006, at the age of 23. [*id.*].  Immediately before residing with A. Wahab, she lived in a home owned by her aunt. [App. 055-056][S. Wahab LKJ Depo at 27-28].

The Commission and Receiver questioned Mrs. Wahab about her status as a principal of LKJ and Wert and about her role in certain decisions and transactions.  She admitted generally that she was an officer and director of LKJ, but asserted her Fifth Amendment privilege when asked the same general question about Wert. [App. 051-052, 065-066][S. Wahab LKJ Depo at 9; S. Wahab Wert Depo at 7-12].  She produced the organizational documents relating to both corporations. [App. 053-055, 201-256][S. Wahab LKJ Depo at 15-24, Exhs. 32 and 33].  She also identified her signature and drivers license on paperwork relating to the sale of the Ferrari to Lamborghini Houston in August 2008, after entry of the Interlocutory Order. [App. 059-060, 151-152][S. Wahab LKJ Depo at 43-46, Exh. 20].  Otherwise, S. Wahab asserted the Fifth Amendment privilege with respect to all questions about her role in the corporations and their transactions, as described by Mackert.  For example, S. Wahab used the Fifth Amendment to shield herself from testifying about the following subjects:

- Her knowledge of the  freeze orders imposed on A. Wahab by the Court;  [App. 058][S. Wahab LKJ Depo at 38-39].

- The source of funds to pay living expenses for A. Wahab, herself and their family during the asset freeze; [App. 058, 068-070.  [S. Wahab LKJ Depo at 39; S. Wahab Wert Depo at 19-20, 23-29].

- Her role in, and knowledge about, the formation of LKJ and Wert. [App. 057, 065-066, 201-256][S. Wahab LKJ Depo at 33-36; S. Wahab Wert Depo at 7-12; Depo Exhs. 32-33].

- Her specific positions as director, officer and shareholder of LKJ and Wert; [*id.*].

- Her knowledge of the Commission's investigation of WFG and its principals and the ensuing litigation; [App. 058][S. Wahab LKJ Depo at 37-39].

- Any and all activities of LKJ, including the purchase and sale of the Ferrari, the source of funds to purchase the automobile, and subsequent disbursement of proceeds of the sale;  [App. 058-061, 140-160][S. Wahab LKJ Depo at 40-54, Exhs. 18, 19 and 20].

- Any and all activities of Wert; [App. 066-070][S. Wahab Wert Depo at 12-15, 21-26].

- The assets owned by LKJ and Wert; [App. 058-059, 066][ S. Wahab LKJ Depo at 41; S. Wahab Wert Depo at 12].

- The acquisition, title and transfer to Wert of the property located at 5606 White Birch Run, Spring, TX; [App. 066-068][S. Wahab Wert Depo at 13-16, 21].

- The construction and furnishing of the White Birch House and the source of funds to construct and furnish the White Birch House and to pay other expenses related to the White Birch House; [App. 060-061, 067-070][S. Wahab LKJ Depo at 48 and 54; S. Wahab Wert Depo at 16-22, 26, 29].

- Assets currently owned by A. Wahab and S. Wahab or purchased by them; [App. 055-061, 066-067, 069-070][S. Wahab LKJ Depo at 26-27, 32, 43, 48-49; S. Wahab Wert Depo at 13-14, 17, 25, 27].

- Transfer of funds from A. Wahab to Mackert's trust account; [App. 068][S. Wahab Wert Depo at 18, 21].

- Distribution of funds to S. Wahab from Mackert; [App. 060, 068][S. Wahab LKJ Depo at 47-48; S. Wahab Wert at 18-20].

- A. Wahab's chief sources of income during 2008; and [App. 056][S. Wahab LKJ Depo at 28-29].

- Foreign travel and business by A. Wahab. [App. 070][S. Wahab Wert Depo at 28].

In light of S. Wahab's pervasive assertion of the Fifth Amendment privilege in this civil action, the Court should draw an appropriate adverse inference as it weighs the evidence in this proceeding. *See Baxter v. Palmigiano,* 425 U.S. 308, 318-20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997). Even without such an inference, however, evidence of her complicity in violations of the Court's freeze orders is conclusive.

**B.    A. Wahab and S. Wahab, with Mackert's Assistance, Secretly Transferred $2 Million to an Offshore Account and Have Spent the <u>Funds During the Asset Freeze</u>**

In April 2008, Mackert helped the Wahabs open an offshore account at HSBC Bank in Jersey in the Channel Islands. [App. 402-403, 405-428][Lim Dec., Exh. 1].   Once the joint account was opened, Mackert provided $2 million from his trust account to fund the offshore account. [App. 388-389; 465][Mackert IOLTA Docs; Lim Dec., Exh. 1].   In an attorney letter to HSBC Bank, Mackert explicitly represented that these funds belonged to Adley Wahab. [App. 408-410][Lim Dec., Exh. 1].

Shortly after the Court entered the June 5 Order freezing A. Wahab's assets, the Wahabs opened a separate account at HSBC Bank solely in S. Wahab's name. [App 492-

493][Lim Dec., Exh. 1].  While A. Wahab's assets were frozen, A. Wahab and S. Wahab transferred more than $1 million from the joint HSBC account to S. Wahab's separate account. [*id.*].

After learning about the Jersey account, the Commission contacted the JFSC, seeking assistance in obtaining account records and preserving the funds. [App. 402-403][Lim Dec. at ¶¶ 2-4].  The HSBC records reflect that A. Wahab and his wife have disbursed more than $1 million from the offshore HSBC accounts for the benefit of A. Wahab and his family. [App. 465 and 500][Lim Dec., Exh. 1].  Information received from the JFSC indicates that the HSBC accounts have a current balance of approximately $700,000, down from a starting balance of $2 million.  Nearly all of the funds were spent during the asset freeze. [*id.*].

The HSBC Bank documents include a fax from Adley Abdulwahab, dated June 10, 2008, requesting the offshore bank to wire transfer $75,000 for the benefit of Komie and Associates to account number 873988 at The Northern Trust Bank located at 50 South La Salle Street. [App. 483][Lim Dec., Exh. 1].  A. Wahab's bank statement for the corresponding period reflects that the funds were wired to Komie on June 10, 2008. [App. 467][Lim Dec., Exh. 1].

S. Wahab's deposition in December 2008 apparently had no sobering impact on her knowing participation in the dissipation of A. Wahab's assets.  She continued, without hiatus, to disburse funds from the HSBC accounts well into February 2009. [App. 535-537][Lim Dec., Exh. 1].

On January 29, 2009, the Commission copied Defendants' counsel on an e-mail in which Commission trial counsel informed Kristen Brown of MMWA about the transfer of funds to Jersey and asked the that she explore this transfer as well as the account.  Prior to this communication, neither Defendants nor their counsel were aware that the Commission had discovered the offshore banking activity in Jersey.

Less than two weeks later, on February 20, 2009, S. Wahab contacted HSBC Bank and attempted to withdraw $650,000, nearly all of funds remaining in the accounts, and sought to disburse the funds to the Wahabs, their relatives and to Mackert. [App. 537][Lim Dec. at ¶ 3, Exh. 1]. Fortunately, HSBC Bank, at the request of the JFSC, froze the funds, refusing to comply with the Wahabs' effort to once again violate the freeze.

These transactions, together with evidence of A. Wahab's other ongoing violations of the Interlocutory Order, demonstrate that A. Wahab's funds and assets will not be secure as long as their preservation is left in the hands of A. Wahab, his wife and his other allies. Accordingly, as set forth below, the Commission requests that the Court impose remedies that will facilitate marshalling and conserving assets even in the face of extreme lawlessness.

In the account opening documents, the Wahabs' stated reason for opening an offshore account is that they are considering moving out of their home jurisdiction. [App. 416][Lim Dec., Exh. 1]. In addition to this admission, other evidence reinforces the possibility that the Wahabs may flee. [Maniaci at ¶ 7; Seale Dec. at ¶ Yowell Dec. at ¶¶ 4-6]. A. Wahab's foreign citizenship, his large number of relatives in the Middle East, including Jordan and Israel, and his business interests in Dubai would all facilitate flight and relocation of the Wahab family. [*id*.]. Moreover, based on the evidence presented here, it would not be surprising if A. Wahab and S. Wahab have established a nest egg in an offshore location that has not yet been discovered.

## IV. THE CONSPIRACY TO VIOLATE THE ASSET FREEZE HAS BEEN FACILITATED BY A. WAHAB'S CONTINUED FLAUNTING OF THE HIS OBLIGATIONS UNDER THE REPORTING AND ACCOUNTING PROVISIONS OF THE INTERLOCUTORY ORDER

In its First Contempt Motion, the Commission established that the Defendants were in violation of several provisions of the Interlocutory Order. A. Wahab's continued violations of the same provisions of the Interlocutory Order discussed in the First Contempt Motion have facilitated the scheme described in this Memorandum.

Paragraph 7 of the Agreed Interlocutory Order permits each of the individual Defendants to pay "reasonable and ordinary living expenses." This provision, however, contains requirements that facilitate the ability of the Commission to monitor these expenditures to assure that the Defendants do not abuse this privilege. The Defendants are required to open new bank accounts for the purpose of depositing and withdrawing funds to pay living expenses. Further, Paragraph 7 states that only funds earned after the entry of the Interlocutory Order may be deposited into this account and used as "living expenses." To facilitate monitoring, the Defendants are required to provide the Commission with identifying information about each of their new accounts within three (3) days from the date the account is opened. Finally, the Defendants were required to provide the account statements for these accounts at the end of August and, thereafter, required to provide itemized quarterly reports of their expenses.

A. Wahab has continued to render these requirements a nullity by failing to provide information, or by providing false or incomplete information, in response to the reporting requirements of the Interlocutory Order. A. Wahab has never identified a new bank account from which he agrees to deposit newly-earned funds to use as his sole source of reasonable living expenses. A. Wahab also disregarded his obligation to provide the Commission with August account statements relating to a designated account. On February 4, 2009, still without identifying his newly-opened account or his source of funds, A. Wahab finally provided a barebones document apparently intended belatedly to fulfill his obligation to provide a report of his expenses in the beginning of October 2008 ("February Report"). [App. 540-543].

The February Report is most noteworthy for the expenditures that are entirely omitted. The report fails to disclose the funds disbursed from Mackert's trust account for the Wahabs' benefit or money withdrawn from the offshore accounts at HSBC Bank. [*id.*]. Against such conspicuous and complete dishonesty, the existing freeze order is an impotent remedy.

On March 3, 2009, MMWA released an unofficial draft of its accounting ("MWAA Draft Report"). A review of the entries in the MMWA Draft Report demonstrates that A. Wahab views with derision the possibility that this Court will have the resolve to enforce its orders with appropriate sanctions and effective remedies. A. Wahab has provided virtually none of the essential information necessary to make his financial affairs more transparent. In particular, as of ***March 3, 2009***, A. Wahab has never disclosed to MMWA: (1) ownership of the Ferrari; (2) ownership of the White Birch House; (3) the expenditures from the Jersey accounts in violation of the asset freeze; or (4) the millions of dollars held for him in the Mackert trust account. [App. 565-566, 568, 572, 588, 594, 601, 617]. In fact, in spite of the unambiguous language of the Interlocutory Order, A. Wahab has entirely failed and refused to provide MMWA with an accounting of his current assets. [App. 565-566, 568, 572] [*See also* Appendix in Support of Plaintiff's Memorandum in Opposition to Defendants' Motion to Strike and In Support of Plaintiff's Motion for Summary Judgment, App. 001-003, Gary Maberry Dec. at ¶ 8][Docket # 160].

Even more recently, A. Wahab demonstrated the futility of any remedy that depends on his disclosure of financial information. Immediately after receiving A. Wahab's cryptic and inadequate February Report, the Commission attempted to obtain through formal discovery the information he should have provided under the reporting requirements of the Interlocutory Order. On February 5, 2009, the Commission served A. Wahab with Plaintiff's Second Request for Production to Defendant Adley H. Abdulwahab a/k/a Adley Wahab ("Requests").[12] [App. 626-633]. Defendant Adley H. Abdulwahab a/k/a Adley Wahab's Answers to Plaintiff's Second Request for Production ("Answers"), served on ***March 19, 2009***, is a litany of spurious objections interspersed with assertions of the Fifth Amendment privilege. [App. 634-665].

---

[12]        The Requests are incorrectly dated "January 5, 2009."

Again, A. Wahab excludes any information relating to the Ferrari, the White Birch House, the funds transferred to and from the Mackert trust account or the existence of, or disbursements from, the Jersey accounts. [*id.*].  Defendant's Answers confirm that A. Wahab will simply evade and defy any mandate that requires his cooperation or participation.  For this reason alone, the appointment of a receiver to marshal and converse his assets is essential.

In its First Contempt Motion, the Commission stated that

> Defendants' ongoing violations of the reporting and monitoring provisions of Paragraph 7 raise the reasonable inference that Defendants are violating the requirement that they pay living expenses only from newly earned funds.  Defendants' recalcitrance, however, is preventing the Commission from determining whether the Defendants are dissipating funds and assets in violation of the freeze.

The information discovered by the Commission since the first contempt hearing demonstrates that the inference the Commission urged upon the Court was, at least as to A. Wahab, correct. These subsequent events also establish that it is now more urgent than ever for the Court to impose appropriate sanctions against A. Wahab and assist investors with more potent remedies.

## V.  THE COURT SHOULD ISSUE AN ORDER OF CONTEMPT AGAINST A. WAHAB, MACKERT, S. WAHAB AND KOMIE

### A.  Civil Contempt is Appropriate to Redress A. Wahab's Failure to Comply With This Court's Orders

A court has the inherent power to enforce compliance with its lawful orders and mandates by contempt.  *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *Powell v. Ward*, 643 F.2d 924 (2d Cir. 1981), *cert. denied*, 454 U.S. 832 (1981).  This power is essential to the proper conduct of the judicial function:  without it, courts would be unable to preserve decorum or assert their authority by order or decree.  *See, e.g., In re Williams*, 306 F. Supp. 617, 618 (D.D.C. 1969).

The Commission seeks an order directing A. Wahab to show cause why he should not be cited for civil contempt, a remedial device here intended to achieve full compliance with the Court's orders, for the Commission and investors' benefit. *See Hicks v. Feiock*, 485 U.S. 624, 631 (1988); *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Petroleos Mexicanos v. Crawford Enter., Inc.*, 826 F.2d 392, 399-400 (5th Cir. 1987).   A party commits contempt when he "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order."   *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987), *cert. denied*, 487 U.S. 1205 (1988), *quoting SEC v. First Fin. Group*, 659 F.2d 660, 669 (5th Cir. 1981).

In a civil contempt proceeding, the Commission has the burden of establishing by clear and convincing evidence:

> (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order.

*Petroleos Mexicanos v. Crawford Enter., Inc.*, 826 F.2d at 401.   Once a *prima facie* showing of a violation has been made, the burden of production shifts to the alleged contemnor to offer a defense, if any, to his violation. *CFTC v. Wellington Precious Metals, Inc.,* 950 F.2d 1525, 1529 (11th Cir. 1992).

The defendant's intent to violate the Court's order or his willfulness -- although abundantly apparent here – is not a prerequisite for a civil contempt sanction.   *See McComb v. Jacksonville Paper Co.*, 336. U.S. at 191; *Whitfield v. Pennington*, 832 F.2d at 913.   Instead, the question is simply whether a party has complied with the Court's order.   *See Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d 165, 168 (5th Cir. 1980); *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984). "'[I]n civil contempt proceedings the question is not one of intent but whether the alleged

contemnors have complied with the court's order.'" *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d at 168 (quoting *United States v. Ross*, 243 F. Supp. 496, 499 (D.C.N.Y. 1965)). "Good faith is not a defense to a civil contempt; the question is whether the alleged contemnor complied with the court's order." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).

In this matter, there is abundant evidence that A. Wahab has engaged in serious and ongoing violations of the June 5 Order and the Interlocutory Order, issued by the Court to keep A. Wahab's personal assets available for potential monetary relief to the victims of Defendants' fraud.  The evidence demonstrates that A. Wahab, with the assistance of Mackert and S. Wahab, created an elaborate scheme to hide assets and to circumvent the restrictions imposed by the freeze order.

A. Wahab transferred more than $12 million to Mackert's IOLTA account.  With Mackert's assistance, he then opened bank accounts in Jersey and had Mackert transfer millions of dollars to these offshore havens.  Through the Mackert trust account and HSBC accounts, A. Wahab has spent significantly more than $1 million in violation of the Court's asset freezes. Moreover, A. Wahab placed assets under the nominal control of corporations and used this subterfuge in August 2008 in an effort to conceal the sale of his Ferrari in violation of the freeze.  The evidence, including participants' own admissions, demonstrates that these violations are likely ongoing.

**B.     Mackert, S. Wahab and Komie Aided and Abetted A. Wahab's Violations**

Non-parties with actual notice of the court's order who knowingly aid and abet another in violating the court's order may also be held in contempt. *See NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 954 (5th Cir. 1989); *Waffenschmidt v. Mackay*, 763 F.2d 711, 714 (5th Cir. 1985). "Although good faith is irrelevant as a defense to a civil contempt order,

good faith is relevant to whether [a non-party] aided or abetted [a party] in dissipating the funds with knowledge that [the non-party] was violating the court's orders." *Waffenschmidt*, 763 F.2d at 726.

Mackert plainly aided and abetted A. Wahab's violations of the Court's freeze orders. Indeed, but for Mackert's facilitation, the violations could not have occurred.  Moreover, Mackert admits knowing about the Commission's investigation and litigation against A. Wahab and, specifically, about the asset freeze.

While Mackert's testimony concerning when he learned about the freeze orders is ambiguous, the Commission submits the evidence establishes Mackert knowingly aided and abetted A. Wahab's violations.  The Commission served Mackert with the June 5 Order less than a week after it was entered and Mackert testified that he read the order at the time he first saw it.[13]  Mackert stated that it was "possible" that he read the Interlocutory Order before the Ferrari sale, which would have preceded most of the disbursements to S. Wahab.

In spite of Mackert's purported uncertainty about the timing of his knowledge of the Interlocutory Order, there is a plethora of evidence from which the Court may draw a negative inference about Mackert's state of mind and credibility.  Because direct evidence of an actor's guilty knowledge is frequently hard to come by, it is well established that circumstantial evidence can prove knowledge and intent.  *See, e.g., United States v. Londondio*, 420 F.3d 777, 786 (8th Cir. 2005); *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995); *United States v. Richards*, 638 F.2d 765, 768-69 (5th Cir. 1981).

Mackert's role in orchestrating the scheme to hide assets and expenditures militates against any claim that he was ignorant of the freeze during illicit transactions.  Moreover, Mackert admitted that he was disbursing funds to S. Wahab within the two weeks before his

---

[13]     At the same time, Mackert was served with an entire set of the Commission's papers in support of emergency relief. [Docket # 44].

testimony.  Clearly, Mackert knew about the Interlocutory Order long before many of these disbursements, otherwise his lack of memory would be inexplicable.  Mackert's propensity to engage in the prohibited transactions, notwithstanding knowledge of the asset freeze, is also supported by his testimony that he was never concerned about whether the Wahabs' activities violated the Court's freeze order.

Furthermore, Mackert's credibility is damaged by at least three demonstrably false statements he made during his deposition.  First, Mackert testified that the funds to purchase A. Wahab's Ferrari came from one of Mackert's clients in Nevis. [App. 017-020][Mackert LKJ Depo at 66-77, Exh. 19].  The records from Mackert's trust account, however, establish that he never received funds from Nevis and particularly not from the client he identified. [App. 265-272][Sparks Dec. at ¶¶ 6, 8-10, Exh. 1].  Second, Mackert testified that he was not aware that A. Wahab had any foreign bank accounts. [App. 021][Mackert LKJ Depo at 81].  In light of the evidence of Mackert's participation in creating and funding the Wahabs' accounts in Jersey, this statement is unquestionably a lie.  Finally, Mackert testified that he had never received any wire transfers from A. Wahab. [App. 014][Mackert LKJ Depo at 53-54].  In fact, as discussed herein, A. Wahab wired Mackert millions of dollars.          .

Mackert cannot argue that he acted in good faith.  As a licensed attorney, Mackert had an obligation to ask questions about the reason for the elaborate façade created to conceal A. Wahab's assets and expenditures.  Mackert did not do this.  To the contrary, he has taken the position that he remained willfully blind to the legal implications of his own, and his client's, activities.  *See Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (concluding that "conscious avoidance" of facts, which "occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and

realized its probability, but refrained from confirming it in order later to be able to deny knowledge," equates to knowledge).

Similarly, S. Wahab's participation in the scheme to circumvent the asset freeze is not merely marginal, but essential to A. Wahab's violations.  She allowed herself to be a principal of LKJ and Wert.  In these capacities, she participated in the unlawful sale of the Ferrari and was the direct recipient of the payments from Mackert's trust account, which she then spent for purposes not authorized by the Court's asset freeze.  She also participated in hiding A. Wahab's funds in offshore accounts at HSBC Bank.  Finally, she was chiefly responsible for making surreptitious expenditures of A. Wahab's funds while they were subject to the freeze orders.

Because of her pervasive assertion of the Fifth Amendment privilege, S. Wahab's mental state is not as transparent as Mackert's.  She asserted her Fifth Amendment privilege to avoid answering crucial questions about her knowledge of the Commission's investigation of WFG and its principals and the ensuing litigation, her knowledge of the freeze orders imposed against A. Wahab by the Court and the source of funds to pay living expenses for A. Wahab, herself and their family during the asset freeze.  Nonetheless, her culpable state of mind may be inferred from her participation in covert conduct, as well as her assertion of the Fifth Amendment privilege,  *See Baxter v. Palmigiano,* 425 U.S. at  318-20; *LiButti v. United States,* 107 F.3d at 121.  The issues of S. Wahab's knowledge and good faith are both subject to this adverse inference. *Raffel v. US,* 271 U.S. 494, 497 (1926); *US v. One Parcel of Property,* 897 F. 2d 97, 102 (2d. Cir. 1990)(proper to draw adverse inference from wife's assertion of the Fifth Amendment privilege that she had knowledge of her husband's drug trafficking); *In re Alstom SA,* 454 F. Supp. 2d. 187, 208 and FN17 (S.D.N.Y. 2006)(proper to draw negative inference from Fifth Amendment assertion in response to deposition questions about subject's knowledge); *CFTC v. Int'l Fin.,* 323 F.Supp.2d 482, 505, 507 (S.D.N.Y. 2004) (invocation of Fifth

Amendment privilege justified adverse inference that defendant lacked good faith and had knowledge of corporation's violations); *SEC v. Autocorp Equities, Inc.* 292 F.Supp.2d. 1310, 1324 (D.Utah 2003) (defendants' "incriminating knowledge" established by adverse inference).

Even without an adverse inference, the duration and depth of S. Wahab's participation in the deceptive scheme betrays her knowledge and belies any claim of good faith. Particularly telling is her continued participation in clandestine activities even after her deposition by the Commission alerted her about the seriousness of her conduct. S. Wahab, while young, is an adult with no apparent or demonstrated mental disability. It defies reason to conclude that she participated in these labyrinthine activities without suspicion that the activities served an unlawful purpose.

Komie's acceptance of the $75,000 transfer from A. Wahab's offshore account also aided and abetted a violation of the freeze by A. Wahab. A. Wahab was personally served with the June 5 Order before he initiated the wire transfer to Komie on June 10, 2008. [Docket # 46]. Komie accepted the funds while A. Wahab was subject to the June 5 Order and retained the funds even after participating in the negotiation of the Interlocutory Order.[14] Accordingly, Komie is obligated to disgorge funds he received during the freeze. *See, FTC v. Assail, Inc.,* 410 F.3d 256, 266 (5th Cir. 2005) (attorney who accepts fees from a pool of frozen assets must disgorge the funds; insufficient to simply accept the client's representation that funds are not subject to the freeze).

---

[14] The Commission finds it troubling that during the course of its negotiations with Mr. Komie about the terms of an agreed freeze order to replace the June 5 Order, including discussions in which the Commission explicitly opposed any provision allowing the release of funds to pay attorney's fees, Defendants' counsel never disclosed that he had already received these funds from A. Wahab while the *ex parte* asset freeze was in effect. Equally troubling is Mr. Komie's decision not to disclose his retention of these funds to the Court in connection with its consideration of the Interlocutory Order.

**VI.    THE COURT SHOULD ISSUE APPROPRIATE SANCTIONS AND REMEDIES
AGAINST A. WAHAB, MACKERT, S. WAHAB AND KOMIE**

**A.    Coercive Sanctions Should be Issued to Compel Compliance with the
Court's Orders and to Rectify the Damage Caused by A. Wahab's
Violations**

"Upon a finding of contempt, the district court has broad discretion in assessing

sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ.*

*Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citing *Am. Airlines v. Allied Pilots Ass'n*,

228 F.3d 574, 585 (5th Cir. 2000)). "Judicial sanctions in civil contempt proceedings, may in a

proper case, be employed for either or both of two purposes: to coerce the defendant into

compliance with the court's order, and to compensate the complainant for losses sustained."

*Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d at 585 (quoting *United States v. United Mine*

*Workers of Am.*, 330 U.S. 258, 303-04 (1947)). "The imposition or denial of sanctions of

necessity involves a fact-intensive inquiry into the circumstances surrounding the activity that is

the subject of sanctions." *Test Masters*, 428 F.3d at 582 (quoting *Thomas v. Capital Sec. Servs.,*

*Inc.*, 836 F.2d 866, 873 (5th Cir. 1988) (en banc).

Coercive sanctions imposed in civil contempt proceedings ordinarily are conditional, and

the contemnor may avoid the sanctions by complying with the order. *Hicks v. Feiock*, 485 U.S.

at 632-35 (1988); *See also Penfield Co. of California v. SEC*, 330 U.S. 585, 590 (1947).[15] When

---

[15]    In determining whether a contempt proceeding is civil or criminal, "the critical features are the
substance of the proceeding and the character of the relief that the proceeding will afford." *Hicks v. Feiock,*
485 U.S. at 631. While both civil and criminal contempt proceedings are necessarily expository of the Court's
authority, "'[i]f [a proceeding] is for civil contempt the punishment is remedial, and for the benefit of the
complainant.  But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the
court.'"  *Id.*, 485 U.S. at 631, *citing Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911).  In
*Hicks*, the Court explained that the "character of the relief" did not hinge on the penalty imposed, but the
conditional nature of the remedy, stating, "[a] conditional penalty . . . is civil because it is specifically
designed to compel the doing of some act."  *Id.*, 485 U.S. at 633.  Thus, the "critical feature that determines
whether the remedy is civil or criminal in nature is not when or whether the contemnor is physically required
to set foot in a jail but whether the contemnor can avoid the sentence imposed upon him, or purge himself
of it, by complying with the terms of the original order."  *Id.*, 485 U.S. at 635, n. 7.  *See also Shillitani v.*
*United States*, 384 U.S. at 368-69 (1966).

a contempt sanction is coercive, "the district court has broad discretion to design a remedy that will bring about compliance." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982) (citing *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Powell v. Ward*, 643 F.2d 924, 933 (2d Cir. 1981) (per curiam)).

Incarceration is an appropriate coercive sanction.  "A fixed term of imprisonment, with the proviso that the contemnor will be released if he complies with the court order, is a proper penalty for civil contempt and the imposition of such a penalty does not make the proceeding criminal." *Id.*  A district court may order the civil contemnors imprisoned until they comply with the order or condition imposed by the court. *FDIC v. LeGrand*, 43 F.3d 163, 168 (5th Cir. 1995); *see also Hutto v. Finney*, 437 U.S. 678, 690 (1978) ("Civil contempt proceedings may yield a conditional jail term[.]").

The court is also permitted to impose a conditional fine for the purpose of compelling the contemnor to comply with the court's order, provided the amount is reasonably designed to force compliance, without being punitive. *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) (per curiam) (citing *United Mine Workers*, 330 U.S. at 303-04 1947).  "A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases." *Id.* (citing cases and treatise). "Unlike criminal contempt where imprisonment and a fine cannot be combined, a finding of civil contempt permits the coercive combination of both fine and imprisonment." *In re Dinnan*, 661 F.2d 426 (5th cir. 1981) 1150 (citation omitted).

A. Wahab's violations of the Interlocutory Order have continued for many months without redress from the Court.  Coercive sanctions should be imposed on A. Wahab, requiring him immediately to: (1) cease his unlawful expenditure of funds funneled back to him from

Mackert's trust account and from any other undisclosed sources, including foreign accounts[16];
(2) replace the funds he has surreptitiously and illegally spent during the asset freeze; and (3)
bring himself into compliance with all of the provisions of the Interlocutory Order.  The
Commission recommends that the Court incarcerate A. Wahab until he proves that he has
ceased his violations and cured the further damage he has done to his victims.  Moreover, the
Court should impose an escalating daily fine for each additional day that A. Wahab is not in
compliance.

Mackert, S. Wahab and Komie should be subjected to similar remedies.  The Court
should issue an order requiring Mackert, S. Wahab and Komie immediately to: (1) cease aiding
and abetting violations of the Court's Interlocutory Order; and (2) return or replace the funds
that were illegally spent with their assistance.  These mandates should also be enforced
through the coercive sanctions of incarceration and a daily fine.

The respondents can easily remedy their contumacy by complying with the requirements
of the Interlocutory Order.  While incarcerated, they can cure their contumacy through
communication with their counsel or, if counsel is unavailable, another agent.  They will be their
own jailers, and their attention to their obligations will be assured while they remain
incarcerated.

While these sanctions may seem harsh, they are necessary and just.  The respondents
have wantonly disregarded this Court's mandates.  Indeed, they participated in a complex
scheme to dissipate assets that should have been preserved for the benefit of elderly victims.
Having suffered no personal consequences after the hearing on the First Contempt Motion, A.
Wahab continued both the violations then known to the Commission and those still hidden by a

---

[16]    As the Commission states below, the only adequate protection against A. Wahab's dissipation of
assets is to place his assets under receivership.  The Commission recommends that the Court order A.
Wahab and the other respondents to turn the recovered or replacement funds over to the Receiver.

veil of deceit.  Only full-blooded remedies will make it clear to A. Wahab and his cohorts that this Court expects full compliance with its mandates and is prepared to enforce this expectation.

**B.**     **A. Wahab and S. Wahab Should Be Subject to a Broad Asset Freeze And a Receiver Should be Appointed Over Their Assets**

The principal purpose of the federal securities laws is to protect investors by requiring the full disclosure of information material to investment decisions, by compensating defrauded investors, and by deterring fraud and manipulative practices.   *Randall v. Loftsgaarden,* 478 U.S. 647, 664, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986).  Because these laws are remedial in nature, they are to be liberally construed.  *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 493 (6th Cir.1990);   *Castleglen, Inc. v. Commonwealth Sav. Ass'n,* 689 F.Supp. 1069, 1072 (D.Utah 1988).  In an SEC enforcement action, the district court has the authority, through its equitable jurisdiction, to fashion an appropriate remedy on a proper showing of a securities violation.   *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1103 (2d Cir.1972). The ultimate remedies available to the court include disgorgement, restitution, and rescission.   *SEC v. Current Fin. Servs., Inc.,* 783 F.Supp. 1441, 1443 (D.D.C.1992).

To preserve a basis for such equitable remedies, the district court may impose an interim asset freeze and appoint a Receiver. *CFTC v. Am. Metals Exchange Corp.,* 991 F.2d 71, 79 (3d Cir.1993); *SEC v. Unifund SAL,* 910 F.2d 1028, 1041 (2d Cir.1990).  An asset freeze is appropriate "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir. 2005) (rejecting defendant's claim that the Commission's claim for a civil penalty would limit the Commission's ability to obtain an asset freeze for a defendant's ill-gotten gains).  An asset freeze ensures that a defendant's assets are not secreted or dissipated prior to final judgment being entered in the case.  *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d. Cir. 1974), *cert. denied*, 417 U.S. 932 (1974), SEC v. *Manor Nursing Ctrs.,* Inc., 458 F.2d  at 1106 (fraudulent nature of appellants' violations and

uncertainty regarding amount and location of proceeds warranted asset freeze to preserve the status quo). To obtain an asset freeze, the Commission need only establish that it is likely to succeed on the merits of its claims. *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). A court may order an asset freeze even in the absence of a preliminary injunction. *SEC v. Unifund SAL*, 910 F.2d at 1037.

Also included in the court's equitable powers is the authority to appoint receivers. For instance, in *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 439 (5th Cir. 1981), the Court appointed a receiver to take control of corporate assets "[i]n order to protect the public welfare – and especially the interests of those who invested with [the defendants]."

A federal court may exercise jurisdiction over non-parties to effectuate equitable relief.[17] The court's jurisdiction extends to assets which have been unlawfully diverted from an asset freeze. *SEC v. Pinez*, 989 F.Supp. 325, 337 (D.Mass.1997) (stating a district court has jurisdiction to enter asset freeze order on non-party's assets when the non-party has no legitimate claim to the assets); *SEC v. Comcoa, Ltd.,* 887 F.Supp. 1521, 1524-25 (S.D.Fla.1995) (holding that funds transferred to lawyer's trust account for benefit of defendants were subject to freeze), *aff'd sub nom., Levine v. Comcoa, Ltd.,* 70 F.3d 1191 (11th Cir.1995). Moreover, a receiver may be appointed over a non-party who controls assets purportedly belonging to a party in receivership. *FTC v. Olmstead,* 528 F.3d 1310, 1312 (11th Cir. 2008)(non-party LLC's added as receivership entities); *In re San Vicente Medical Partners, Ltd.,* 962 F.2d 1402, 1408 (9th Cir. 1992)(district court had authority to include property of non-party limited partnership in receivership order issued in connection with SEC action as long as non-party met minimum

---

[17]     The Commission does not intend to name Mackert, S. Wahab or Komie as relief defendants. This is chiefly because the funds received and/or transferred by Mackert, S. Wahab and Komie do not appear to be proceeds from the WFG fraud. Nonetheless, these funds were assets of A. Wahab and, therefore, clearly subject to the Court-imposed asset freeze which applied to all assets, not merely those traceable to the Defendants' violations of the federal securities laws.

contacts test).  Most notably, a non-party may subject itself to the jurisdiction of the court

when the non-party knowingly acts in concert with a party to circumvent the court's mandates.

*SEC v. Pension Fund of Am., L.C.,* 2006 WL 1104768 *11 (S.D. Fla.) ("Nonparties, such as

Defendants' spouses, 'may be subject to [the] court's jurisdiction if, with actual notice of the

court's order, they actively aid and abet a party in violating that order'"), quoting, *United States*

*v. Barnette,* 129 F.3d 1179, 1185 n. 10 (11th Cir. 1997).  *See also FDIC v. Faulkner,* 991 F.2d

262, 267 (5th Cir. 1993)(district court did not err in exercising jurisdiction over non-party wife

and freezing assets where she actively participated with husband to make fraudulent transfers).

More stringent provisional relief in this case is critical to providing investors with the

benefits of the monetary relief supported by the evidence.  As the Commission has

demonstrated in several filings and at the contempt hearing, there is little or no probability that

liquidation of corporate assets presently under receivership will be sufficient to provide victims

with adequate relief.  The revenue from these assets will fall far short of restoring to elderly

WFG investors the savings they relinquished.  Accordingly, as the Commission has repeatedly

argued, it is vital to victims that the Court's remedies adequately preserve Defendants' personal

assets from dissipation, beyond what is necessary to maintain a mere subsistence.

The Commission requests that, as to A. Wahab, the Court abrogate the asset freeze

contained in the Interlocutory Order.  In its place, the Commission asks the Court to impose on

A. Wahab and S. Wahab an asset freeze with no exceptions or only a very small monthly

allowance, perhaps $200 or $300.  The onus should be placed on the Wahabs to approach the

Court and justify, through specific evidence, any additional expenditure.  Moreover, no

expenditures should be approved until the Wahabs have fully disclosed their current assets and

net worth.

No assets are safe, however, while they are in the possession and control of A. Wahab and S. Wahab.  Since July 30, 2008, A. Wahab has been subject to the asset freeze in the Interlocutory Order.  By completely disregarding every obligation imposed by the Court, the Wahabs have dissipated nearly $2 million in spite of the Court's mandates.  This is a tragedy for the elderly victims of Defendants' fraud who are looking to this Court for protection and, ultimately, monetary relief.  The Commission submits that the evidence presented here should surmount any previous doubts the Court may have harbored about whether a receivership over A. Wahab's assets is justified or necessary.  What we have learned conclusively demonstrates that extension of the Receivership to include A. Wahab's assets is long overdue.

In further support of this conclusion, the Commission reminds the Court that A. Wahab's pattern of deceit was well-established even before the discovery of his shadowy scheme to violate the asset freeze.  On June 5, 2008, the Commission submitted papers and evidence in support of, among other relief, the appointment of a Receiver.  Together with its June 5 Memo, the Commission submitted a voluminous evidentiary Appendix. [Not Docketed].  As the June 5 Memo describes, the Appendix demonstrates that A. Wahab committed, with a high degree of *scienter*, an egregious fraud against senior citizens.

This evidence establishes that A. Wahab took advantage of these seniors by falsely representing that the SDOs sold by WFG were as safe, or safer than, a certificate of deposit because the investment was guaranteed by two major insurance companies.  In fact, as Defendants knew, they never acquired any policies that insured the SDOs.  Moreover, the evidence demonstrates that A. Wahab and his co-Defendants misused and misappropriated virtually 100 percent of the funds collected from investors and used them to purchase and/or operate risky start-up businesses.

It is also both fair and necessary to subject S. Wahab's assets to these remedies.  The evidence gathered by the Commission supports the conclusion that S. Wahab's assets, if any, are derived from A. Wahab.  Assets under her name, or subject to her control, include substantial property obtained as a consequence of A. Wahab's violations of the Court's asset freeze.  Although S. Wahab asserted the Fifth Amendment privilege against self-incrimination during her deposition to avoid responding to most of the Commission's questions, she did answer a number of questions relating to her education and employment history and her financial circumstances.  The information provided by S. Wahab established with a high degree of certainty that she contributed little, if any, of the funds in either the Mackert trust account or the HSBC Accounts.

Yet S. Wahab obtained control of millions of dollars while her husband was subject to the asset freeze.  As the principal of the shell corporations established by Mackert, she received and spent hundreds of thousands of dollars disbursed from the Mackert trust account.  She participated in the unlawful sale of A. Wahab's Ferrari and disbursed these funds in violation of the assets freeze against A. Wahab.  Finally, she participated in creating the joint and separate HSBC accounts in Jersey, accepting after the asset freeze the transfer of more than $1 million into her separate account and she used her signatory authority to dissipate more than $1 million of the funds deposited in the offshore accounts.

S. Wahab's conduct during the Commission's civil injunctive action, and particularly during the asset freeze, demonstrates that she has no scruples about facilitating the dissipation of frozen assets.  The HSBC Bank records establish that S. Wahab has continued to transfer frozen funds through at least the latter half of February 2009.  Whether motivated by loyalty to her husband or by her desire to maintain her luxurious lifestyle, she poses a serious threat to preserving assets for investor relief.  To prevent further damage to investors, S. Wahab's assets should be frozen and placed under the authority of the Court-appointed Receiver.

The Commission submits that the Court should require no additional evidence adduced at another hearing to reach the conclusion that the appointment of a Receiver is a necessary means of ensuring that victims of Defendants' fraud obtain the maximum possible monetary relief. The Commission requests that the Court act in the interest of WFG investors on the basis of the substantial and compelling evidence already before the Court.

      C.      **Asset Freeze on Mackert's Financial Accounts**

Where necessary to effectuate equitable relief, Courts have frozen funds in the financial accounts of attorneys, including in their trust accounts. *SEC v. Credit Bancorp, Ltd.,* 386 F.3d 438 (2d Cir. 2004); *SEC v. Comcoa, Ltd.,* 887 F.Supp. 1521 (S.D.Fla.1995) (holding that funds in a trust account held by defendants' lawyer on behalf of defendants were subject to freeze), *aff'd sub nom. Levine v. Comcoa, Ltd.,* 70 F.3d 1191 (11th Cir.1995). In this case, the Commission has uncovered evidence that millions of dollars were hidden in Mackert's attorney trust account to conceal them from the Commission and, eventually, from the Court. Given the breadth of respondents' scheme, Mackert may be holding funds of A. Wahab in other accounts, either derived from the money sent to the trust account or from separate transfers. Temporarily freezing Mackert's financial accounts would appear to be a reasonable response to the Mackert's broad and prolonged aiding and abetting.

Between September and November 2007, A. Wahab transferred $12.6 million to Mackert's attorney trust account. While the Commission does not yet have complete records of the trust account for the relevant period, the account may still hold a substantial portion of these funds. Moreover, millions of dollars have been transferred from Mackert's trust account to other banks, including offshore accounts, or disbursed to S. Wahab.

Although the Commission has warned Mackert that he may be civilly, or even criminally, liable for continuing to dissipate these funds, Mackert has refused to give the Commission any

assurances that he will maintain the status quo.  The Commission seeks an order freezing the financial accounts of Mackert to ensure that he does not attempt to spend, transfer, or otherwise dispose of funds he has obtained, directly or indirectly, from A. Wahab and any other Defendant.

The Commission is aware that freezing Mackert's financial accounts may temporarily disrupt his business affairs.  This disruption, however, is a minor event compared with the further devastation that Mackert has helped A. Wahab inflict on WFG's elderly victims.  If undoing the damage Mackert has done requires him to suffer a modicum of discomfort, he is in no position to complain.  Moreover, the magnitude and duration of any disruption of Mackert's business is within his own control.  By accounting for the funds he received and agreeing to mitigate the damage he has caused to victims, Mackert can return to the normal conduct of his business. *See FTC v. Arlington Press, Inc.,* 1999 WL 33574020 * 13 (C.D. Cal.)(freeze effecting operation of ongoing business justified where benefit of securing redress for the injured outweighs the harm that may be suffered by individuals associated with the business.).

> **D.    Sworn Accountings by S. Wabab, Mackert and Komie**

In order to facilitate appropriate remedies, the Court should require S. Wahab, Mackert and Komie to account for any funds or assets they have received, directly or indirectly, from A. Wahab. This accounting should include the period from June 1, 2007 to the present, in order to include assets, like the $12.6 million, that may have been transferred before the asset freeze, but were dissipated during the asset freeze.  This financial information will enable the Commission to determine the potential liability of Mackert, S. Wahab, and Komie, as well as facilitate the recovery of funds from the respondents and other third-parties.[18]

---

[18]    The Commission does not ask the Court to repeat the error of appointing an outside accounting firm to perform the accounting, as the Court was requested to do in the Interlocutory Order.  The respondents and their counsel should be capable of compiling the required information.

E.     **Additional Ancillary Relief**

In light of the Wahabs' own statements, A. Wahab's background and their present circumstances, the Commission submits that the Court should issue an order requiring A. Wahab and his wife to surrender their passports.  The Commission submits that evidence also supports the issuance of a repatriation order requiring that the Wahabs return all foreign assets to the United States.  Funds should be repatriated and deposited in the Receiver's trust account.  Other repatriated assets should be turned over to the Receiver.  Such equitable relief is especially appropriate where the Commission is seeking an accounting and disgorgement in its prayer for relief as in the case at bar.  *SEC  v. R.J. Allen & Assoc., Inc.*, 386 F. Supp. 866, 880-881 (S.D. Fla. 1974).

In their application to open the joint offshore account at HSBC Bank, the Wahabs explicitly state that they are considering establishing a residence outside the United States.  Other evidence corroborates the possibility of flight.  A. Wahab also has significant ties to foreign jurisdictions.  Although he was born in the United States, he has joint American and Egyptian citizenship and has relatives throughout the Middle East, including Israel and Jordon.  Moreover, the Commission has been informed by several sources that A. Wahab has a construction business in the country of Dubai.

These facts, together with the transfer of millions of dollars to offshore bank accounts, suggest that both A. Wahab and S. Wahab may attempt to flee the United States before this litigation is concluded.  Accordingly, the Commission requests an order requiring A. Wahab and his wife to surrender their passports to the Court.  This order will ensure the efficacy of whatever equitable relief might ultimately be granted.  *See R. J. Allen & Assocs., Inc.*, 386 F. Supp. at 881.

VII.    **CONCLUSION**

For the reasons set forth above, the Commission respectfully requests that this Court

issue show cause order and order contempt sanctions against Adley Wahab for his repeated

and continuing violations of the Court's freeze orders and against Russell Mackert and Sarah

Wahab for aiding and abetting Adley Wahab's violations.

Dated and signed on the 27th day of March, 2009.

> *s/ Jeffrey B. Norris*
> JEFFREY B. NORRIS
> SENIOR TRIAL COUNSEL
> Washington, D.C. Bar No. 424258
> U.S. SECURITIES & EXCHANGE
> COMMISSION
> 801 Cherry St., 19th Floor
> Fort Worth, Texas  76102
> Office:  (817) 978-6452
> Fax:   (817) 978-4927
> Norrisj@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2009, I electronically filed the foregoing *Memorandum In Support of Application of Plaintiff Securities and Exchange Commission For Order To Show Cause Why Defendant Adley Wahab Should Not Be Held In Civil Contempt For Failure To Comply With The Court's Orders And Why Russell Mackert, Sarah Wahab and Stephen Komie Should Not Be Held In Contempt For Aiding and Abetting Adley Wahab's Contemptuous Conduct* with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participants.

Jeffrey B. Norris, *Counsel for Securities and Exchange Commission*
Vernon Jones, *Receiver*
John Teakell, *Counsel for Defendants*
Stephen Komie, *Counsel for Defendants*
John S. Brannon, *Counsel for Receiver*
Mitchell E. Ayer, *Counsel for Receiver*
Randy West Williams, *Counsel for Receiver*
Thomas L. Taylor, III, *Counsel for Movants*
Barry G. Flynn, *Counsel for Mackert*

I further certify that on the 27th day of March, 2009, I served a true and correct copy of the foregoing *Memorandum In Support of Application of Plaintiff Securities and Exchange Commission For Order To Show Cause Why Defendant Adley Wahab Should Not Be Held In Civil Contempt For Failure To Comply With The Court's Orders And Why Russell Mackert, Sarah Wahab and Stephen Komie Should Not Be Held In Contempt For Aiding and Abetting Adley Wahab's Contemptuous Conduct* and the notice of electronic filing by depositing a copy thereof in the U.S. Mail or by electronic mail or in an authorized Federal Express depository at Fort Worth, Texas, with first class or overnight express charges prepaid and addressed to the following parties and persons entitled to notice that are non-CM/ECF participants:

Kennth Cunniff, Esq.                  Mr. Edward A. Mallett, Esq.
20 South Clark Street, Suite 1050     Mallett & Saper, L.L.P.
Chicago, Illinois 60603               JP Morgan Chase Tower
                                      600 Travis Street, Ste 1900
                                      Houston, Texas 77002

                                      s/ Jeffrey B. Norris
                                      Jeffrey B. Norris